**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0345n.06

No. 15-1561

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 22, 2016
DEBORAH S. HUNT, Clerk

ALYSON LUUKKONEN,

      Plaintiff-Appellant,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

_____/

BEFORE:    COLE, Chief Judge; CLAY and GIBBONS, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiff Alyson Luukkonen ("Plaintiff") appeals from the district court's order upholding the Commissioner of Social Security's ("Commissioner") denial of Plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. For the reasons discussed below, we **AFFIRM**.

**BACKGROUND**

Plaintiff filed an application for SSI on January 24, 2011. At that time, she was twenty-four years old and had no prior work experience. Her claim for disability was supported by medical records, reports from physicians and psychologists, and standard forms and questionnaires prepared shortly after her application was submitted. For example, Plaintiff filled out a "Function Report" form as part of her application. In that report, Plaintiff asserted that she suffered from, *inter alia*, chronic pain, difficulty concentrating, short-term memory loss,

migraines, poor sleep, depression, irritable bowel syndrome ("IBS"), chronic bladder infections, and allergies. She also stated that, depending on the severity of her symptoms at any particular time, she had trouble performing various physical tasks—e.g. lifting, standing, reaching, and walking—and that she sometimes required assistance with dressing and bathing. She also reported difficulty with following instructions.

Plaintiff attributed many of her physical and mental limitations to fibromyalgia.[1] She also claimed to suffer from body dysmorphic disorder ("BDD"),[2] which manifested as a reluctance to socialize, constant mirror checking, compulsive behavior, a need to wear sunglasses around strangers, and low self-esteem. On the other hand, when she was feeling well, Plaintiff enjoyed working on arts and crafts, "surfing" the internet, and watching television. She also stated that she had a boyfriend and that she kept in touch with friends using her computer. She would, on occasion, do her own shopping.

In April 2011, at the request of Michigan's Disability Determination Service, Plaintiff was evaluated by consultative psychologist Dr. Steve Geiger. During her evaluation, Plaintiff reported the same symptoms that were described in her Function Report. Plaintiff also told Dr. Geiger that she lived with her grandparents and that they did her laundry, housekeeping, and meal preparation, and that they were her sole source of financial support. Dr. Geiger reported that Plaintiff's clothing was neat and clean, and her grooming and hygiene were good. She had good contact with reality, was pleasant, and was oriented to person, place, and time. Dr. Geiger

---

[1] The Social Security Administration describes fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012).

[2] BDD is "a mental disorder in which a normal-appearing person is either preoccupied with some imagined defect in appearance or is overly concerned about some very slight physical anomaly." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 549 (32d ed. 2012).

also reported Plaintiff's performance on a number of simple tests: Plaintiff "remembered 7 digits forward and 4 digits backward;" she "remembered 2 of 3 objects after three-minute delay;" she could perform basic mathematical calculations, including counting backwards from 100 by 7s; she could explain common proverbs. (R. 10-5, PageID 504–05.) At the conclusion of his report, Dr. Geiger opined:

> I believe [Plaintiff] could understand and follow simple instructions. She could perform simple routine tasks. She would have considerable difficulty working in any environment where she had to have interactions with others. She is extremely self-conscious about the way she looks [and is] very worried about the judgments other people make about her face and body. She would have significant difficulty handling work pressure and stress and would have difficulty effectively communicating with coworkers, customers and supervisors. . . . She is in need of ongoing psychiatric and psychological treatment.

(*Id.* at 505.)

On May 9, 2011, Plaintiff visited Dr. Carol Beals, a rheumatologist, for an initial investigational visit. (R. 10-5, PageID 522.) Plaintiff's chief complaints at that examination were "[f]ibromyalgia and all over pain." Dr. Beals' report from that visit described Plaintiff as a "delightful, very pleasant 25-year-old female who is alert, oriented and appropriate in all manners. She [was] wearing sunglasses, although she did take them off when" requested. (*Id.* at 524.) Dr. Beals observed that Plaintiff was 5'5" tall, weighed 174 pounds, and appeared to have hypermobility in all of her joints. Plaintiff told Dr. Beals that she had recently lost 140 pounds of weight over 15 months, and that she had "been exercising on the stationary bike every day. Sometimes, she does this for hours. . . . She has used a treadmill from time to time for exercise." (*Id.* at 523.) At the conclusion of her report, Dr. Beals opined that, based on her initial evaluation of Plaintiff, it appeared that she did "meet the criteria for fibromyalgia syndrome." (*Id.* at 525.)

Plaintiff soon after learned that Michigan's Disability Determination Service had denied her claim for SSI. Plaintiff retained an attorney and submitted a request to the Social Security Administration ("SSA") for a hearing by an administrative law judge ("ALJ").

On July 20, 2011, Plaintiff returned to Dr. Beals. In a report prepared after that visit, Dr. Beals wrote:

> Patient comes in today for a target visit for disability appointment. . . . She is here to discuss disability since she does not feel that she can work and she has been denied disability . . . . I will need to talk with her lawyer . . . and see what [is] the best approach. I think that the psychiatric condition is the primary reason that she cannot work in the public and that psychiatric evaluation would be most appropriate.

(R. 10-5, PageID 558–59.) The report also noted that Plaintiff refused to be weighed during this visit, and that Plaintiff's "hypermobility syndrome, fibromyalgia, and somatic dysfunction have not changed since her initial evaluation." (*Id.* at 559.)

On July 20, 2011—the same day as Plaintiff's visit to Dr. Beals—Plaintiff's counsel sent a letter to Chief ALJ Thomas Walters. In that letter, Plaintiff's counsel asserted that Dr. Geiger's April 2011 report, discussed above, "failed to provide specific assessments relative to the functioning of" Plaintiff. (R. 10-2, PageID 187.) The letter thereafter requested that Judge Walters issue a subpoena requiring Dr. Geiger to testify at Plaintiff's hearing before the ALJ, or that Dr. Geiger be ordered to answer interrogatories addressing the alleged deficiencies in his report.

On August 11, 2011, Plaintiff visited Dr. Tatyana Sigal, a psychiatrist that Plaintiff had previously seen between 2004 and 2006. During that visit, Plaintiff stated that she felt "really ugly" and that she could not take care of herself. Dr. Sigal opined that Plaintiff: was alert and oriented to person, place, and time; was pleasant and cooperative; made good eye contact; had a well-organized thinking process with no signs of psychosis; and had "fair" levels of attention,

concentration, memory, insight, and judgment. Dr. Sigal noted that Plaintiff's mood was depressed, but stable, and that her affect was broad and congruent with her mood. On August 23, 2011, Dr. Sigal completed a two-page mental residual functional capacity ("RFC")[3] assessment form, in which Dr. Sigal rated Plaintiff's limitations in each of twenty categories of mental ability. Dr. Sigal rated Plaintiff to be: (1) "not significantly limited" in three categories; (2) "moderately limited" in seven categories; and (3) "markedly limited" in ten categories. This form, however, had no accompanying explanation of Dr. Sigal's ratings.

Plaintiff's administrative hearing was held on March 1, 2012; Paul Jones was the presiding ALJ. At that hearing, Plaintiff testified that she was disabled due to chronic pain, fatigue, and fear of being around others. She stated that she slept for more than twelve hours a day. She also testified that she had sporadic migraines and the common symptoms of IBS. Upon questioning by the ALJ, Plaintiff admitted that she was able to graduate from high school despite her illnesses and fear of being around others. A vocational expert was thereafter called to testify regarding Plaintiff's ability to find work. The ALJ asked the expert whether there were jobs for someone with Plaintiff's educational background and lack of prior work experience, assuming that Plaintiff had the RFC to perform unskilled, medium work[4] limited to simple tasks with only occasional public interaction. The expert opined that several potential jobs existed for someone with those characteristics, including box bender, sweeper, and production helper.

---

[3] SSA regulations define RFC as "the most [a claimaint] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c).

On March 8, 2012, the ALJ issued a decision denying Plaintiff's claim for SSI. The ALJ applied the traditional five-step process for evaluating disability benefits claims.[5] At step one, the ALJ determined that Plaintiff had not engaged in any substantial activity since the date of her application. At step two, the ALJ found that Plaintiff's obesity, affective disorder, BDD, and fibromyalgia constituted severe impairments. The ALJ noted, however, that Dr. Beals' conclusion that Plaintiff suffered from fibromyalgia was necessarily based on Plaintiff's subjective complaints of pain and tenderness in certain places on her body. The ALJ also found that Plaintiff's migraines were not a severe impairment because they could be controlled by medication. At step three, the ALJ found that Plaintiff's impairments did not match the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

The ALJ then determined that Plaintiff retained the RFC necessary "to perform medium work, as defined in 20 CFR [§] 416.967(c) . . . except she can only do simple, routine, and repetitive tasks, with only occasional interaction with the public." (R. 9-2, PageID 39.) The ALJ opined: "I find [Plaintiff's] medically determinable impairments could reasonably be expected to cause [her] alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.* at 40.) The adverse credibility

---

[5] Because Plaintiff does not argue that the ALJ inappropriately applied the five-step process, that process is not discussed in detail below. Briefly summarized, however: in steps one through four, a claimant bears the burden of demonstrating: (1) that she did not engage in substantial gainful activity since filing her claim; (2) that she had a severe impairment or combination of impairments; (3) those impairments met or medically equaled the impairments enumerated in SSA regulations; OR (4) those impairments prevented her from performing her past relevant work. *See, e.g.*, *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); 20 C.F.R. § 416.920(b)–(f). At step five, the burden shifts to the Commissioner to prove the existence of "a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

determination was largely based on the lack of objective evidence supporting Plaintiff's subjective assertions of pain and fear of social interaction. The ALJ also rejected Dr. Geiger's and Dr. Sigal's conclusions regarding the work-preclusive severity of Plaintiff's psychological impairments because objective evidence in the record undermined those conclusions.

At step four, the ALJ determined that because Plaintiff had no past relevant work experience, it could not be determined whether she had the RFC to continue such past work. Finally, the ALJ concluded that based on the vocational expert's testimony, Plaintiff was "capable of making a successful adjustment to . . . work that exists in significant numbers in the national economy." (*Id.* at 41.)

Plaintiff's request for review of the ALJ's decision with the SSA's Appeals Council was denied on August 13, 2013, thus making the ALJ's decision the final decision of the Social Security Commissioner. *See* 20 C.F.R. § 416.1481. On October 10, 2013, Plaintiff filed a complaint in federal district court seeking review of the SSA's denial of her claim for SSI. Plaintiff's primary arguments before the district court were: (1) the ALJ failed to properly evaluate Plaintiff's fibromyalgia, polycystic ovarian syndrome ("PCOS"),[6] and psychiatric conditions; and (2) the ALJ erred by failing to issue a subpoena for Dr. Geiger. Plaintiff's case was assigned to a magistrate judge, who issued a report and recommendation affirming the Commissioner's denial of Plaintiff's application. Plaintiff filed objections to the report and recommendation, but the district court adopted the report and recommendation in its entirety. Plaintiff timely appealed.

---

[6] Plaintiff does not reassert her arguments regarding PCOS in this appeal.

## DISCUSSION

### I. The ALJ Properly Assessed Plaintiff's Fibromyalgia

"The court of appeals reviews the district court's conclusion in social security cases *de novo*, and directly reviews the [Commissioner's] findings and conclusions as if it were the first reviewing court." *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990). The Commissioner's final decision must be affirmed if it "is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see also* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "When deciding . . . whether substantial evidence supports the ALJ's decision, we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *see also Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) ("If it is supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently."). Finally, any questions of law are reviewed *de novo*. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

On appeal, Plaintiff argues that the ALJ incorrectly analyzed her fibromyalgia in two ways: first, the ALJ failed to explicitly analyze her fibromyalgia under Social Security Ruling ("SSR") 12-2p; second, the ALJ improperly dismissed Plaintiff's diagnosis of fibromyalgia as necessarily dependent upon Plaintiff's own subjective reports of pain. We address these alleged errors in turn.

## A.    SSR 12-2p

On July 25, 2012, the SSA released SSR 12-2p ("the Ruling"), which "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims . . . ." SSA 12-2p, 2012 WL 3104869, at *1 (July 25, 2012).  To that end, SSR 12-2p describes criteria for establishing that a person has a medically determinable impairment ("MDI") of fibromyalgia, *id.* at *2–3, the sources of evidence the ALJ may look to, *id.* at *3–4, and how a claimant's subjective assertions of pain and functional limitations are evaluated, *id.* at *4.  The Ruling also states that fibromyalgia should be analyzed under the traditional five-step evaluation process used for analyzing other claims for SSI.  *Id.* at *5–6.  Importantly, as Plaintiff concedes in her brief before this Court, SSR 12-2p "is merely a binding interpretation of that which was already lawfully in effect."  (Pl.'s Br. at 21.)  In other words, SSR 12-2p merely provides guidance on how to apply pre-existing rules when faced with a claimant asserting disability based on fibromyalgia.

Plaintiff argues that "the Commissioner failed to apply SSR 12-2p in denying the application for benefits."  (*Id.* at 19.)  Below, the district court observed that "Plaintiff fails to explain how the ALJ's RFC assessment contravenes SSR 12-2p or how the Commissioner's final decision should have differed in light of SSR 12-2p."  (R. 24, PageID 655.)  We find the same is true in this appeal.  In addition to the above-quoted assertion that the ALJ "failed to apply SSR 12-2p," Plaintiff ambiguously asserts that the ALJ "failed to enter into any discussion of the factors required by law and the SSR."  (Pl.'s Br. at 21.)  Yet, Plaintiff does not state which "factors" were not discussed.

To the extent these vague arguments suggest that the ALJ failed to explicitly apply 12-2p's diagnostic criteria for determining whether a claimant has an MDI of fibromyalgia, such

error—to the extent it exists—is harmless given that the ALJ concluded (1) that Plaintiff *did* have fibromyalgia, and (2) that her fibromyalgia constituted a "severe impairment" under the second step of the five-step analysis.[7] To the extent Plaintiff argues that the ALJ failed to properly apply SSR 12-2p's guidelines for evaluating a claimant's personal statements about the severity of her own symptoms, that argument is also unavailing. Section IV of SSR 12-2p states that when evaluating a claimant's statements, ALJs must "follow the two-step process set forth in our regulations and in SSR 96-7p."[8] SSR 12-2p, 2012 WL 3104869, at *5. In this case, the ALJ cited SSR 96-7p and explicitly applied the two-step process described therein. Finally, as discussed above, the ALJ applied the standard five-step process for evaluating all disability claims. In sum, although the ALJ did not explicitly cite SSR 12-2p, it nevertheless applied the Ruling's principles. That is all that is required under our precedents. *McClanahan*, 474 F.3d at

---

[7] These facts also belie Plaintiff's unsupported assertions that "the ALJ obviously fails to accept any legitimacy to the medical diagnosis involving fibromyalgia" (Pl.'s Br. at 21), and that the ALJ "ignor[ed] a diagnosis of fibromyalgia." (*Id.* at 24.)

[8] Under this two-step process:

[1.] There must be medical signs and findings that show the person has an MDI(s) which could reasonably be expected to produce the pain or other symptoms alleged.

. . .

[2.] Once an MDI is established, we then evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work. If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.

SSR 12-2p, 2012 WL 3104869, at *5.

834 ("Because the ALJ conducted the analysis required by the Ruling, his failure to mention it by name is not fatal to the decision.").[9]

**B.      The ALJ's alleged rejection of Plaintiff's fibromyalgia**

As we noted above, the ALJ found that Plaintiff did have fibromyalgia, and that her fibromyalgia constituted a severe impairment.  In so finding, the ALJ primarily relied on the opinion of Dr. Beals and her determination that Plaintiff "had 14 of 18 fibromyalgia 'tender points.'" (R. 9-2, PageID 37.)  However, the ALJ added that "the basis of such a finding necessarily depends upon what 'points' a patient subjectively describes as 'tender.'" (*Id.*) Relying on this language, Plaintiff argues that the ALJ completely dismissed her diagnosis of fibromyalgia.  Plaintiff thereafter devotes a considerable portion of her brief arguing that her diagnosis of fibromyalgia is supported by objective evidence in the record.

These arguments appear to be based on a misreading of the ALJ's decision.  The ALJ actually accepted Plaintiff's diagnosis of fibromyalgia and considered it a severe impairment. Thus, to the extent the ALJ was skeptical of Plaintiff's diagnosis, such skepticism ultimately had no effect on the disposition of Plaintiff's claim.  It is true that the ALJ later found Plaintiff's statements regarding her fibromyalgia "not credible;" but this credibility determination pertained to Plaintiff's claims regarding the limiting effects of fibromyalgia on her ability to work. Making such a credibility determination was not legal error.  As explained in SSR 96-7p (which is cited in SSR 12-2p), "whenever [an] individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's

---

[9] Because we hold that the ALJ properly applied the principles of SSR 12-2p, we decline to address the parties' arguments regarding whether the Commissioner was bound by the Ruling even though the ALJ denied Plaintiff's application for SSI before the Ruling was released on July 25, 2012.

statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.").

Notably, Plaintiff does not argue that the ALJ's credibility determination was incorrect or unsupported by substantial evidence. Thus, that issue is waived. *See Enertech Elec., Inc. v. Mahoning Cty. Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996). Even if she had raised this issue, however, we would be inclined to affirm the ALJ's credibility determination because it is supported by substantial evidence. *See Rogers*, 486 F.3d at 241. As both the magistrate judge and the district court observed, Dr. Beals (Plaintiff's fibromyalgia specialist) did not identify any functional restrictions stemming from plaintiff's fibromyalgia, and Plaintiff failed to provide any additional evidence supporting her statements regarding the debilitating effects of her fibromyalgia. *See* 20 C.F.R. § 416.945(a)(3) (establishing that a claimant is generally responsible for providing evidence used to determine residual functional capacity).

Moreover, despite her claim of pain so debilitating that she was unable to work, Plaintiff was able to, *inter alia*: complete high school and a year of college; lose 140 pounds by riding on a stationary bike every day, sometimes for hours at a time; do her own grocery shopping; travel to and stay with her out-of-state boyfriend; and maintain appropriate hygiene. This constitutes evidence that "a reasonable mind might accept as adequate to support" the ALJ's determination that Plaintiff maintained the RFC to work, despite her statements to the contrary. *Richardson*, 402 U.S. at 401.

We therefore find no error in the ALJ's assessment of Plaintiff's fibromyalgia.

## II.    The ALJ Properly Assessed Plaintiff's Psychological Impairments

Drs. Beals, Geiger, and Sigal all opined that Plaintiff's psychological conditions rendered her unable to work; all of these opinions were rejected by the ALJ. On appeal, Plaintiff argues that in rejecting these expert opinions, the ALJ was necessarily replacing the experts' medical judgments with his own. For example, Plaintiff cites the ALJ's rejection of the opinion of Dr. Sigal, Plaintiff's treating psychologist, regarding Plaintiff's capacity to work. In that section of his decision, the ALJ stated:

> In August 2011, Dr. Sigal gave claimant work preclusive limitations (Exhibit 13F). This opinion is not explained by his report, nor is it consistent with the record as a whole. Dr. Sigal reported claimant was alert, oriented x3, pleasant, and cooperative. He said claimant's thinking process was well organized and that she had no morbid preoccupations. Therefore, I reject this opinion.

(R. 9-2, PageID 40.) In response, Plaintiff argues that "[n]o expert evidence suggests that being able to think and be pleasant rules out a disability from performing competitive work for forty hours a week. A medical judgment is required to conclude that a 'well organized thinking process' is necessarily consistent with work activity." (Pl.'s Br. at 25–26.) Plaintiff later asserts, "[t]o argue that some symptoms identified support a diagnosis, and some do not, is necessarily a medical judgment." (*Id.* at 28.)

We find these arguments unavailing. First, as above, these arguments are based partly on a misreading of the ALJ's decision. The ALJ never disagreed with or attempted to refute the diagnoses of the medical experts; rather, the ALJ disagreed with those experts' conclusions regarding Plaintiff's capacity to work. Second, determining how certain diagnoses and symptoms bear on a claimant's capacity to work is not exclusively a "medical judgment," but a matter explicitly within the ALJ's purview:

> When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of

your symptoms so that we can determine how your symptoms limit your capacity for work . . . .

20 C.F.R. § 416.929(c)(1). Along that line, SSA regulations provide ALJs with the authority to disagree with medical experts' opinions on the ultimate question of a claimant's capacity to work: "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that you are disabled." 20 C.F.R. § 416.927(d)(1).

Plaintiff also focuses—somewhat cryptically—on her "symptoms." She argues that "[m]any symptoms are specified in the medical records before this Court. The claimant has testified to a variety of symptoms." (Pl.'s Br. at 28.) She thereafter asserts that "[a]t the very least there must be some medical basis to conclude that a specific sign or symptom is supportive, or detracts from a claim." (*Id.*) Again, this argument is based on a misunderstanding of the applicable regulations and the role of the ALJ. Although the ALJ may consider statements by medical experts regarding how a particular symptom affects the claimant, *see* 20 C.F.R. § 416.929(c)(1), such statements are neither required nor dispositive of the ultimate issue of disability. *Id.* Rather, it is the Commissioner's prerogative to determine whether a certain symptom or combination of symptoms renders a claimant unable to work. *Id.*; *see also* 20 C.F.R. § 416.927(d)(2).

We note that Plaintiff's briefing on this issue again fails to argue that the ALJ's determinations were not supported by substantial evidence. Plaintiff does argue that "there is ample evidence that disability results from the findings and symptoms that are in fact present." (Pl.'s Br. at 28.) However, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999) ("Even if the evidence could also support another

conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached."). Rather, we must uphold the ALJ's decision so long as it "is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers*, 486 F.3d at 241; *see also* 42 U.S.C. § 405(g).

Once again, however, we would be inclined to affirm the ALJ's findings regarding Plaintiff's psychological impairments. Despite her claims of being largely incapable of normal social interaction, every physician to have seen Plaintiff described her as some variant of polite, oriented, and responsive. Dr. Geiger noted that Plaintiff's clothing was neat and clean, and her grooming and hygiene were good. Although the record indicates that Plaintiff often wore sunglasses when interacting with her physicians, it also indicates that she was willing to remove them when asked. Finally, Plaintiff herself stated that she had a boyfriend and often spoke with friends online. Based on the above, we would conclude that the ALJ's determination that Plaintiff had "moderate" difficulties in social functioning is supported by substantial evidence.

In terms of Plaintiff's mental functioning, Dr. Geiger observed that Plaintiff's thoughts were logical and organized. Dr. Geiger also stated that Plaintiff "remembered 7 digits forward and 4 digits backward;" she "remembered 2 of 3 objects after three-minute delay;" she could perform basic mathematical calculations, including counting backwards from 100 by 7s; she could explain common proverbs. (R. 10-5, PageID 504–05.) Dr. Geiger opined: "I believe [Plaintiff] could understand and follow simple instructions. She could perform simple routine tasks." (*Id.* at 505.) These findings are consistent with Plaintiff's own statements that she sometimes did arts and crafts, and that she often used her computer for internet and email. With such facts in the record, we would conclude that the ALJ's determination that Plaintiff had

"moderate" difficulties with regard to "concentration, persistence, or pace" is supported by substantial evidence. (R. 9-2, PageID 38.)

Finally, we would find that based on the above evidence, the ALJ was entitled to reject the medical experts' opinions regarding Plaintiff's psychological impairments' effect on her capacity to work. When making a disability determination, an ALJ must consider the opinions of experts in light of the entire record. *See* 20 C.F.R. §§ 416.927(b), 416.920b(b). The ALJ should weigh expert opinions based on, *inter alia*, the strength of relevant evidence supporting those opinions, the opinions' consistency with the record as a whole, and whether the experts are opining on issues within their area of expertise. 20 C.F.R. § 416.927(c)(3)–(5). In this case, the ALJ correctly noted that neither Dr. Geiger's nor Dr. Sigal's conclusion regarding Plaintiff's inability to work was explained, and their own statements regarding Plaintiff's demeanor tended to contradict their conclusions. Moreover, Dr. Beals' opinion that Plaintiff's inability to work was likely due to her psychological impairments was not entitled to much weight because Dr. Beals' own comments called her impartiality into question and because she had no apparent expertise in psychology or psychiatry.

In sum, we conclude that the ALJ did not err in analyzing Plaintiff's mental impairments.

## III.     The ALJ Did Not Err By Failing to Issue a Subpoena of Dr. Geiger

An ALJ's decision regarding a claimant's request to issue a subpoena is reviewed for abuse of discretion. *See Calvin v. Chater*, 73 F.3d 87, 88 (6th Cir. 1996). "When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses . . . ." 20 C.F.R. § 416.1450(d)(1).

> Parties to a hearing who wish to subpoena documents or witnesses must file a
> written request for the issuance of a subpoena with the administrative law judge
> or at one of our offices at least 5 days before the hearing date. The written request

must give the names of the witnesses or documents to be produced; describe the address or location of the witnesses or documents with sufficient detail to find them; state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena.

20 C.F.R. § 416.1450(d)(2). "[A] social security claimant does not have an absolute right to subpoena a physician who submits a pre-hearing report, but rather the administrative law judge has the discretion to issue a subpoena 'where necessary for the full presentation of a case.'"[10] *Flatford v. Chater*, 93 F.3d 1296, 1300–01 (6th Cir. 1996) (footnote omitted) (citing *Calvin*, 73 F.3d at 93).

On July 18, 2011, Plaintiff received a form letter from the SSA explaining the administrative hearing process. That letter stated:

> If a physician, expert, or other person is not providing documents important to your case, you may ask the ALJ to issue a subpoena. . . . The ALJ will issue a subpoena only if he or she thinks the evidence is necessary to decide your case, and the evidence cannot be obtained another way. You must ask the ALJ to issue a subpoena at least 5 days before your hearing date. Send your request in writing to the address at the top of the first page of this letter.

(R. 9-4, PageID at 96.) That form letter was signed: "Sincerely yours, Thomas L. Walters . . . Chief Administrative Law Judge." (*Id.*) Two days later—on July 20, 2011—Plaintiff's counsel sent a letter to the address specified by the SSA, requesting the issuance of a subpoena to Dr. Steven Geiger. Plaintiff's letter was addressed to Chief Judge Walters. Plaintiff's letter asserted that Dr. Geiger's Consultative Evaluation Report "identifie[d] specific psychiatric diagnoses of significance which may cause serious functional limitations," but that the Report "failed to

---

[10] Plaintiff notes that an SSA "Acquiescence Ruling, AR 91-1 actually concludes that a subpoena is automatically required when requested by a claimant in this situation, at least as acquiesced to in the Fifth Circuit." (Pl.'s Br. at 30–31.) As her argument concedes, however, the automatic subpoena requirement to which AR 91-1 refers applies only in the Fifth Circuit. *Cf. Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990). This Circuit has declined to adopt the Fifth Circuit's automatic rule, and has explicitly held that issuing a subpoena is a matter within the discretion of the ALJ. *Flatford*, 93 F.3d at 1300–01; *see also Passmore v. Astrue*, 533 F.3d 658, 661−63 (8th Cir. 2008) (observing that the Second and Eighth Circuits have also held that ALJ's have discretion to issue subpoenas pursuant to 20 C.F.R. § 416.1450).

provide specific assessments relative to the functioning of [Plaintiff]." (R. 10-2, PageID 187.) Plaintiff's letter requested, in the alternative, that Dr. Geiger be directed to answer interrogatories, which she enclosed along with her letter.

Plaintiff's hearing was conducted on March 1, 2012—nearly a year after she sent her original request for a subpoena. Her case was assigned not to Chief Judge Walters, but to ALJ Paul Jones. Plaintiff's request for a subpoena was not mentioned during her hearing. The record contains no evidence regarding a disposition of Plaintiff's request for a subpoena; Plaintiff now asserts that her request was "rebuffed."

Plaintiff argues that the ALJ's failure to grant her request for additional testimony from Dr. Geiger constituted an abuse of discretion. She argues that this was an especially grave error, given that the ALJ explicitly dismissed as unsupported Dr. Geiger's conclusion that Plaintiff would have difficulty handling work pressure and communicating with coworkers. In support of her argument, Plaintiff cites *Urban v. Heckler*, No. 86-541, 1987 WL 11475 (D.N.J. Apr. 21, 1987). In *Urban*, the court held that the claimant's due process rights had been violated when the ALJ relied on reports by unidentified authors, but failed to either strike the reports or issue a subpoena to identify the reports' authors. *Id.* at *2–4. In remanding the claimant's case for further proceedings, the court held that the ALJ's affirmative reliance on statements in the reports that were harmful to the claimant triggered a due process right to cross-examine the reports' author(s). *Id.* at *4 ("[A] 'full presentation' of the case requires that the subpoena issue for cross-examination of the witness. To hold otherwise would allow the claimant to be placed in the impossible position of being unable to cross-examine a witness although faced with an adverse statement from the very witness whose appearance had been sought." (quoting *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975))).

We find the Plaintiff's arguments unavailing for three reasons. First, Plaintiff's case is distinguishable from *Urban* because the ALJ in this case did not explicitly rely on information contained in Dr. Geiger's report when denying Plaintiff's claim. Rather, the ALJ rejected Dr. Geiger's conclusion that Plaintiff would have difficulty working because of an *absence* of supporting evidence in that report. In other words, Plaintiff did not need to cross-examine Dr. Geiger on any damaging statements; she merely wanted to ask Dr. Geiger questions that would bolster her case. Moreover, that absence of information provided only one basis for the ALJ's rejection of Dr. Geiger's opinion. The ALJ also concluded that Dr. Geiger's assertions of Plaintiff's inability to handle the stress of work or effectively communicate with coworkers were not consistent with the record as a whole. The ALJ observed that contrary to Dr. Geiger's unsupported conclusions, Plaintiff "was able to communicate effectively with Dr. Geiger, [her] medical sources, the Agency Field Office employee, and the administrative law judge." (*See* R. 9-2, PageID 40.)

Second, Plaintiff's request for a subpoena failed to establish why the information she sought from Dr. Geiger "could not be proven without issuing a subpoena." 20 C.F.R. § 416.1450(d)(2). Plaintiff's request for a subpoena of Dr. Geiger was based on his "fail[ure] to provide specific assessments relative to the functioning of" Plaintiff. (R. 10-2, PageID 187.) Yet, Plaintiff could have sought such "specific assessments" from her own doctors or experts of her choosing; there was nothing unique about Dr. Geiger's analysis—e.g., statements adverse to Plaintiff—that would necessitate cross-examination of *him*, specifically. Moreover, that the evidence Plaintiff sought could have been proven without issuing a subpoena to Dr. Geiger is evidenced by Plaintiff's own suggestion of an alternative—namely, issuing an interrogatory.

Finally, as the district court noted, at no point during her hearing before ALJ Paul Jones did Plaintiff or her counsel renew her request for a subpoena, object to the lack of ruling on her request for a subpoena, request cross-examination of Dr. Geiger, or present any interrogatories to the ALJ. Plaintiff responds that no cases, regulations, or statutes required her to do any of the above. Although Plaintiff is correct that SSA regulations do not require that requests for a subpoena be renewed during a hearing, as the Commissioner points out, "a claimant is required to 'make every effort' to ensure that all material evidence is received by the [ALJ] by the time of the hearing." *Flatford*, 93 F.3d at 1302; *see also* 20 C.F.R. §§ 416.1435 ("Each party shall make every effort to ensure that the administrative law judge receives all of the evidence . . . ."), 416.912 (establishing claimant's burden to prove disability). By failing to raise her concerns regarding Dr. Geiger's report during her hearing, Plaintiff waived any objection to the deficiency in the record caused by Dr. Geiger's failure to testify. *Cf. Millmine v. Sec'y of Health & Human Servs.*, 69 F.3d 537 (6th Cir. 1995) (table) ("[T]he court finds that plaintiff's failure to object to the ALJ's possible bias during the administrative process constitutes a waiver of plaintiff's objection.").

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment upholding Commissioner's denial of Plaintiff's application for SSI.